112 U.S. 311
 5 S.Ct. 161
 28 L.Ed. 710
 OGDENSBURG & L. C. R. CO.
v.
NASHUA & L. R. CO.[1]
 November 24, 1884.
 
 Sidney Bartlett, for appellant.
 F. A. Brooks, for appellee.
 MILLER, J.
 
 
 1
 This is an appeal from a decree of the circuit court for the district of New Hampshire, dismissing the bill of appellant, who was complainant below. The plaintiff is the owner of a railroad commencing at Ogdensburg, on Lake Ontario, and terminating at Plattsburgh, on Lake Champlain. The defendant owns a road between Nashua and Lowell. The Vermont & Canada Railroad Company, the Vermont Central Railroad Company, the Northern Railroad Company of New Hampshire, the Concord Railroad Company of New Hampshire, the Nashua & Lowell of New Hampshire, and the Boston & Lowell of Massachusetts, were all largely interested in the freight and passenger business which came over the Ogdensburg road from the great lakes for points in New England and Canada, and which went from the latter to the lakes. The Vermont Central and the Vermont and Canada companies were in the hands of receivers, or trustees, appointed by courts under whose control they were, and these trustees had a lease of the Ogdensburg road for 20 years from March 1, 1870. In this condition of the affairs of these companies a contract was made between them all except the Concord Company, the object of which was to secure an increased traffic over all these roads by obtaining control of the Northern Transportation Company of Ohio, which was also a party to the contract, and which was engaged in steamboat transportation on the Western lakes. One of the items of this agreement was that the Ogdensburg Company should advance a sum not exceeding $600,000 to secure this control, which it did, and the only question on the present appeal is whether, by virtue of the contract, the several railroad companies which were parties to it, were bound to repay to the appellant this money at all events, or were only bound to pay out of receipts from the traffic which came to them severally from this transportation company over the Ogdensburg road. This requires a careful examination of the contract, and a consideration of the circumstances under which it was made. The agreement is as follows:
 
 
 2
 'Articles of agreement between the Northern Transportation Company of Ohio, a corporation established under the laws of Ohio, party of the first part; J. Gregory Smith, of St. Albans, Vermont, and George Stark, of Nashua, New Hampshire, parties of the second part; and the trustees and managers of the Vermont Central and Vermont & Canada Railroad Companies, the Northern Railroad of New Hampshire, (the Concord Railroad Corporation of New Hampshire, provided they execute this agreement,) the Nashua & Lowell Railroad Corporation of New Hampshire and Massachusetts, and the Boston & Lowell Railroad Corporation of Massachusetts, parties of the third part; and the Ogdensburg & Lake Champlain Railroad Company, the party of the fourth part.
 
 
 3
 'Whereas, the above-named railroad companies and trustees and managers, which have become parties to agreements hereto annexed, bearing date the twenty-fourth day of February, A. D. 1870, and whose tracks form a large part of the connecting line between Boston, in Massachusetts, and Ogdensburg, in New York, depend largely for their business upon the regular transportation, by steamers, of freight and passengers between said Ogdensburg and the western cities and towns upon the great lakes; and whereas, the party of the first part was chartered to carry on the business of such transportation, but by reason of financial embarrassments is unable to carry it on efficiently, and it is feared that its steamers may be taken from this line; and whereas, the parties of the third part and the party of the fourth part believe it to be for their and the public interest to advance or lend to the parties of the second part some portion of the gross receipts for the transportation of freight and passengers to be brought to and from their line by the steamers of the party of the first part, in order to secure the most regular, efficient, and permanent service by steamers between Ogdensburg and said western cities and towns for the term of nineteen years from the first day of March, A. D. 1871; and whereas, the parties of the second part have agreed to use all sums advanced or lent to them to secure the ownership or the control of the stock of said party of the first part, and otherwise to secure the most efficient management of its business to carry out the purposes of this agreement, and for no other purposes, and to hold all said stock which they may hold or control, and all other property or rights which they may purchase or otherwise acquire with said funds, except debts due from said party of the first part, in trust to secure the repayment of all sums which may be so advanced or lent, as aforesaid, with interest, as hereinafter provided:
 
 
 4
 'Now, therefore, in consideration of the premises, it is covenanted and agreed between said parties as follows:
 
 
 5
 'Article First. That the party of the first part shall, during said term, continue to hold and own as many and as serviceable steamers as it now has, and will keep them properly equipped, seaworthy, and in good running order, and will make such addition to the number of said boats as the business shall require, and will run them for the transportation of freight and passengers between said Ogdensburg and said western cities and towns, at such time and in such manner, and at such rate of freight and fare as shall be satisfactory to the executive committee of the parties of the third part for the time being; or, if there be no such executive committee, or there is any legal impediment to their action, to the satisfaction of the presidents, for the time being, of the third and fourth parties, or a majority of them. And that the party of the first part will keep all other property owned by it in good repair and in serviceable condition, and that, so far as may be practicable during said term, it will send all freight and passengers for points east of Ogdensburg over the lines of the roads of the parties of the third and fourth parts.
 
 
 6
 'A schedule of said steamers and other property is hereto annexed.
 
 
 7
 'Article Second. That the parties of the third part will, during said term, semi-annually reserve out of the gross receipts, either upon said line or upon any road now leased or operated, or which may hereafter be leased or operated by the parties of the third part, or either of them, for the transportation of freight and passengers brought to said line at Ogdensburgh by the steamers of the party of the first part, the sum of one hundred and fifty thousand dollars, or so much thereof as shall be adequate for the purposes herein set forth, and pay over the same to the parties of the second part to be used for the purpose of securing regular, efficient, and adequate service to and from said Ogdensburg as aforesaid; and the party of the fourth part will, in case it shall be necessary to secure the regular and efficient running of said steamers to and from said Ogdensburg, when called upon by parties of the second part, advance from time to time sums not in all exceeding six hundred thousand dollars, to be used by said parties of the second part for the same purposes as said semi-annual payments, and to be pro tanto in lieu thereof, and to be repaid out of said semi-annual reservation as hereinafter provided, it being understood and agreed that each of said parties of the third part shall only be liable to reserve and advance or pay to the parties of the second part, or to the party of the fourth part, as the case may me, its share of such reservation, advance, or payment, to be ascertained by the proportion which said gross receipts of each of said parties bear to the entire amount of said gross receipts between Ogdensburg and points eastward, upon the roads owned, leased, or operated by any of said third parties.
 
 
 8
 'Article Third. That the parties of the second part shall hold all stock and rights to control stock of the party of the first part which they now have or shall purchase or acquire, and all other property or rights that may be purchased or otherwise acquired under this agreement, except debts due from the party of the first part as aforesaid, in trust, to secure the repayment of all sums which the parties of the third and fourth parts, either or any of them, lend or advance under this agreement, and interest thereon at the rate of ten per cent. per annum, payable semi-annually, and shall apply all dividends which they shall receive on said stock and income from other property to repay the same, and in case said sums shall not all have been repaid with interest, as aforesaid, on or before the expiration of said term, or at any time, in case of failure of the third parties, or either of them, to perform the stipulations of this agreement, then said parties of the second part shall, in case the parties hereto of the third and fourth parts shall not otherwise agree, sell said stock and other property at public auction in said Ogdensburg, after advertising the same for at least thirty days in some newspaper published in said Ogdensburg, and a newspaper published in said Boston, and divide the net proceeds among the parties entitled thereto, but any change may at any time, and from time to time, be made in said trust funds by sale, purchase, or otherwise, by said parties of the second part, with the written consent of the presidents for the time being of the parties of the third and fourth parts.
 
 
 9
 'That while the parties of the third part continue to pay the semi-annual interest to the party of the fourth part, and the semi-annual payments to the trustees of the sinking fund as herein provided, the parties of the second part shall pay any dividends or income which they may receive to the parties of the third part, but in case of any default on the part of the parties of the third part said dividends and income shall be paid directly to said Ogdensburg & Lake Champlain Railroad Company and to said trustees of said sinking fund in proportion to the amount of the semi-annual payments to them herein provided, and to be received by them pro tanto in place of said semi-annual payments.
 
 
 10
 'Article Fourth. That in case of vacancy in the number of the parties of the second part, or their successors, by death, resignation, or otherwise, the party of the second part or his successors continuing in the trust may fill the vacancy, subject, however, to the approval of the parties of the third and fourth parts, and that the parties of the second part or their successors are to assume no personal liability to repay the money advanced by the parties of the third and fourth parts, but to apply the same according to the terms of this agreement, and to hold said stock, rights, and other property in trust, and apply the same and the dividends thereon and income thereof as aforesaid.
 
 
 11
 'Article Fifth. That in case the party of the fourth part shall advance any sum or sums amounting to six hundred thousand dollars, or any part thereof, under this agreement, then the parties of the third part are to pay to the party of the fourth part so much of said semi-annual payments reserved from gross receipts as aforesaid as will pay the semi-annual interest on said sum or sums so advanced by the party of the fourth part at the rate of eight per cent. per annum, and shall pay to the persons who may for the time being hold the offices of president and treasurer of the Boston & Lowell Railroad Corporation, and of the Ogdensburg & Lake Champlain Railroad Company, as trustees, such sums semi-annually as will, in the judgment from time to time of said two presidents and treasurers for the time being, when invested as a sinking fund, pay all excess of the advances of the party of the fourth part over five hundred thousand dollars within two years from the date hereof, and the remainder of the principal of said advances on or before the expiration of said term of nineteen years, and also such further sum semi-annually as will, when invested as a sinking fund, in the judgment of said two presidents and treasurers as aforesaid, purchase the existing mortgage bonds of the party of the first part, amounting to four hundred thousand dollars, within ten years from the date hereof, which bonds so purchased shall be held by said trustees of the sinking fund for the security of the parties hereto, as if held under article seventh of this agreement, and that said semi-annual payments are to be made to the party of the fourth part and to said trustees of said sinking fund in place of advances to the same amounts to the parties of the second part, as hereinbefore provided, and are to be ultimately repaid to the parties of the third part out of the dividends, income, and securities purchased or otherwise acquired by the parties of the second part, as herein provided, whether the same shall be held by them or transferred to the trustees of said sinking fund. In no case shall payments to a sinking fund be less than amounts which invested at six per cent. per annum will produce the sum to be paid out of such sinking fund.
 
 
 12
 'Article Sixth. That if, at the end of said term, the sums advanced to the parties of the second part under this agreement shall not have been repaid to the parties of the third part, with interest, as hereinbefore provided, from the dividends of the stock of the party of the first part, or otherwise, the party of the fourth part shall have the right, for six months after the expiration of said term, to purchase at the actual cost thereof, from the parties of the third part, one hundred and twenty-four hundred and fourth parts of the claim for said advances, and, in any event, shall have a like proportionate interest on the same terms under any new arrangement which may be made, and a like proportionate interest in the securities for said claim, or in securities, property, or rights acquired under this agreement, on paying a like proportion of the cost thereof.
 
 
 13
 'Article Seventh. That it shall be the duty of the parties of the second part, if practicable, to procure an extension of the time of payment of the mortgage bonds of the party of the first part, which shall not have been purchased for the sinking fund for five years from the date of maturity; but if it shall be necessary, in order to secure the running of said steamers as aforesaid, for the parties of the second part to use any of the funds advanced to them as aforesaid to purchase or otherwise acquire any debts due from said party of the first part, whether secured by mortgage or not, said parties of the second part shall forthwith assign and transfer all said debts, and all evidences thereof, and all securities therefor, to the persons who may for the time being be trustees of said sinking fund, to be held by them in trust—first, to secure the repayment of all advances or loans made under this agreement by the party of the fourth part, and, after the full payment of said advances or loans, with interest, as aforesaid, to the party of the fourth part, to secure the repayment of all sums paid, advanced, or lent under this agreement by the parties of the third part, with interest, as aforesaid, and that, as long as the semi-annual payments of interest shall be duly made by the parties of the third part to the party of the fourth part, and the semi-annual payment to the sinking fund, as provided in the fifth article of this agreement, said trustees may extend, by renewals or otherwise, the payment of both the principal and interest of said debts of said party of the first part, at their discretion, for a period not exceeding ten years from the date thereof: but, in case of default by the parties of the third part to make said payments of interest and to the sinking fund, as provided in article fifth, said trustees of said sinking fund shall forthwith, if requested, in writing, by the party of the fourth part, proceed to collect said debts, and out of the sums collected pay, from time to time, said semi-annual interest, as provided in article fifth, to the party of the fourth part, and hold the balance, if any, as a part of said sinking fund, and that all of said sinking fund shall finally, at the end of said term, be applied to pay all advances made by the party of the fourth part, and, if any balance shall remain, the same shall be divided among the parties of the third part in such proportions as they shall be entitled to, and, if said sinking fund shall prove insufficient, the parties of the third part shall make up the deficiency out of gross receipts from said business brought by steamers as aforesaid.
 
 
 14
 'Article Eighth. That the parties of the third part, in order to secure the payment to the party of the fourth part, and to the trustees of the sinking fund, of the amount agreed upon semi-annually as hereinbefore provided, will deposit with the manager of the Boston & Lowell Railroad Corporation at Boston, or the person for the time being performing the duties now performed by said manager, before the last day of June and the last day of December of each year of said term, from funds in their hands received from feights and passengers brought to or carried from the line aforesaid by the party of the first part, the amount of the semi-annual payments to be made to the party of the fourth part and to the trustees of said sinking fund; and the party of the fourth part and said trustees are hereby authorized to draw the same, on the first days of each of the following months, on the manager or other person as aforesaid, who is hereby authorized to, and it is hereby agreed shall, make the payments in this article provided for out of sums so deposited, or, in case of failure to make such deposits, out of and to the extent of any funds in the hands of said Boston & Lowell Railroad Corporation, collected in behalf of each of the parties of the third part from joint freight and passengers brought to and from the steamers of the party of the first part.
 
 
 15
 'Article Ninth. The trustees of said sinking fund shall invest the same, so far as shall be found to be reasonably practicable, in any mortgage bonds of the party of the first part, and in the bonds of the party of the fourth part which shall be issued after the date hereof, which last-mentioned bonds, when so purchased, shall be canceled by said trustees of said sinking fund, and, when so canceled, be delivered to the party of the fourth part, and the party of the fourth part shall give a receipt for the amount of the bonds so canceled, and said receipt, filed with the trustees of said sinking fund, shall represent said sinking fund to the amount of the said canceled bonds; and if any other investment of said sinking fund shall be made by said trustees, special regard shall be had to the absolute safety of such investment.
 
 
 16
 'The compensation of said trustees shall be fixed and paid by the parties of the third part, and said trustees shall annually make a written or printed report of their investments and doings to the parties of the third part and party of the fourth part, and such further special reports of said investments and doings as said parties of the third part and party of the fourth part, or either of them, may require.
 
 
 17
 'In witness whereof, the said corporations, parties to this agreement, have respectively caused their corporate seals to be hereto affixed, and their corporate presents to be signed.
 
 
 18
 'Signed, executed, and delivered by their respective presidents hereunto duly authorized, and the said trustees and managers of the Vermont Central and Vermont & Canada Railroad Companies, and the said J. Gregory Smith and George Stark, have hereunto set their hands and seals at Boston, in the common wealth of Massachusetts, this twenty-fourth day of February, A. D. eighteen hundred and seventy-one.'
 
 
 19
 The Ogdensburg road advanced the $600,000, and it was used for the purpose mentioned in the agreement. The transportation company became bankrupt in the year 1874, the business was broken up, and has never been resumed under the contract. A part of the money advanced by the Ogdensburh Company has been paid to it. It made settlements with some of the companies, or their trustees, in regard to its claim, and it brought this suit against the Nashua & Lowell Company for what it alleges to be its proportion of the sum unpaid. It is not asserted by the plaintiff that the parties who are described in the agreement as the partis of the third part are jointly liable for this deficiency. If so, no suit could be maintained against the defendant here without joining the others. It is not asserted that there are any words of express promise to pay by either of those companies the whole or any definite part of this $600,000. The argument of counsel is that there arises an implied promise out of the nature of the transaction. We have looked in vain for anything in the language of the agreement which requires or justifies such an implication. If there were in the agreement any words which showed that the party of the third part had borrowed this money from the party of the fourth part, or that the latter had loaned it to the former, the argument would be of weight. But the language of article 2, which relates to this part of the transaction, is that 'the party of the fourth part will, in case it shall be necessary to secure the regular and efficient running of said steamers to and from Ogdensburg, when called on by the parties of the second part, advance, from time to time, sums not exceeding in all six hundred thousand dollars, to be used by said parties of the second part for the same purposes as said semi-annual payments, and to be pro tanto in lieu thereof, and to be repaid out of said semi-annual reservations as hereinafter prescribed, it being understood and agreed that each of said parties of the third part shall only be liable to reserve and advance or pay to the parties of the second part or to the party of the fourth part, as the case may be, its share of such reservation, advance, or payment, to be ascertained by the proportion which said gross receipts of each of said parties bear to the entire amount of said gross receipts between Ogdensburg and points eastward, upon road owned, leased, or operated by any of said third parties.'
 
 
 20
 It is to be observed, in the first place, that the transaction is here called an advance, and not a loan; and, secondly, that the advance is made to the party of the second part, and not to the party of the third part. This party of the second part was J. Gregory Smith and George Stark, who were made trustees to receive this money, and see to its investment in securing the service of the transportation company, and who were to receive and refund to the Ogdensburg Company, for this advance, a certain proportion of the gross receipts of the railroad companies constituting the party of the third part, which was relied on to repay that company in full. This same article, in the very sentence in which the Ogdensburg Company agrees to advance the money to Smith and Stark, declares that each of the parties of the third part shall only be liable to reserve and advance or pay to the parties of the second part, or to the parties of the fourth part, its share of such reservation, to be ascertained by its proportion of said gross receipts. It is here also said that this advance is to be repaid out of said semi-annual reservation as hereinafter provided. We thus see, in this single article, that the money is to be advanced to the trustees, what use is to be made of it, that it is to be repaid out of a fund called the semi-annual reservation to be after wards provided, and that neither to the trustees nor to the Ogdensburg Company are the parties comprising the third party to become liable beyond its share of this reservation. This reservation is described in the same article of the agreement as a semi-annual sum not exceeding $150,000, or so much as may be adequate for the purposes herein set forth, 'out of the gross receipts either upon said line or upon any roads now leased or operated by the parties of the third part, or either of them, for transportation of freight and passengers brought to said line at Ogdensburg by the steamers of the party of the first part.' By article 4 these trustees are required to hold all the stock of the transportation company which they now have or may acquire, and all other property or rights which they may acquire under this agreement, to secure the repayment of the sums advanced by the Ogdensburg Company and by the parties of the third part, with interest thereon at 10 per cent. per annum. Article 5 makes a further provision for payment, out of this reservation from the gross receipts of the semi-annual interests of this advance by the Ogdensburg Company, and for a sinking fund to pay all in excess of the loan over $500,000, within two years, and the remainder within the nineteen years the contract had to run. It will be observed that this agreement was intended to expire at the same time that the lease of the Ogdensburg road expired. In all this it will be perceived that, while the mode of the repayment of the advance of $600,000 is carefully and repeatedly stated, and the security provided, it is nowhere hinted that the railroad companies of the third part are to be liable for it if these sources of payment fail. Indeed, the third article provides for security for advances which they may make in the same terms that it provides for the party of the fourth part, which is the Ogdensburg Company; and the language we have cited from article second, that each of the parties of the third part is liable only on this account for its proportionate reservation from the proceeds of traffic derived from the Ogdensburg road, leaves little room for further doubt that these resources were alone bound for the repayment of this advance.
 
 
 21
 The learned counsel for appellant makes a forcible argument against this view, based on the assumption that the Ogdensburg company had no interest in the traffic of the roads embraced in this agreement, because, its road being leased for a period coincident with that of this contract, the lessees received all its benefits and the company none. It must be confessed that if the Ogdensburg company had no other interest in the transaction than to secure the repayment of a loan of money and the interest on it, as if made by any other capitalist, the suggestion would be entitled to much weight; but in this assumption counsel is in error. The preamble recites, as one of the main inducements to making the agreement, that 'by reason of financial embarrassments the transportation company will be unable to continue its business, and its steamers will be withdrawn; and whereas, parties of the third part and the party of the fourth part (the Ogdensburg Company) believe it to be for their interest and the public interest to advance,' etc. The interest of the Ogdensburg company is here clearly stated as the cause of its advance of the money, though at the time the agreement was executed its road had already been leased a year, and the fact of the lease is recited in the agreement. Though this lease was for a fixed annual rent, the lessees were the trustees of two other railroad companies which were insolvent, and these trustees could only rely on the profits or receipts arising from this road to enable them to pay the rent. Indeed, so well founded was the apprehension of failure of rent arising from this fact, that in a few weeks after the withdrawal of the boats of the Northern Transportation Company the lease was rescinded, the road restored to the company, and the trustees of the two Vermont railroad companies released from any further liability on the contract we are now trying to construe. It is reasonably certain that the Ogdensburg Railroad Corporation had a deep interest in the success of the enterprise inaugurated by this contract, and probably a larger interest than any other party to the agreement, and clearly saw that it must make this advance, the only thing it did in the matter, at the risk of the success of the adventure, with such security for obtaining a return out of the proceeds of it as the contract gave. A stipulation of the parties was made on submitting the case to the court below, that, if that court held that no liability under the contract attached beyond that for a proportion of the gross receipts, there were no such receipts in defendant's hands, and the bill should be dismissed without requiring an accounting.
 
 
 22
 The circuit court construed the contract as we do, and its decree dismissing the bill is therefore affirmed.
 
 
 23
 BLATCHFORD, J., took no part in the decision of this case.
 
 
 
 [1]
 S. C. 5 Fed Rep. 882.